CLERK'S OFFICE U.S. DISTRICT COURT
AT ABINGDON, VA
FILED

August 26, 2024
LAURA A. AUSTIN, CLERK

By /s/ Kendra Campbell
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ABINGDON DIVISION

BRYAN KIMBLE,

                    Plaintiff,                      Case No.   1:24cv35

v.

UNITED STATES OF AMERICA                    **JURY TRIAL DEMANDED**


and

MICHAEL CHAD HAMILTON
Lieutenant
United States Penitentiary, Lee
Lee County Industrial Park
Hickory Flats Road
Pennington Gap, VA 24277

and

RICKY D. BRADBURN
Officer
United States Penitentiary, Lee
Lee County Industrial Park
Hickory Flats Road
Pennington Gap, VA 24277

and

OFFICER SMITH
Officer
United States Penitentiary, Lee
Lee County Industrial Park
Hickory Flats Road
Pennington Gap, VA 24277

and

CODY RIDINGS
Officer
United States Penitentiary, Lee

Lee County Industrial Park
Hickory Flats Road
Pennington Gap, VA 24277

and

ALAN C. ROBERTS
Officer
United States Penitentiary, Lee
Lee County Industrial Park
Hickory Flats Road
Pennington Gap, VA 24277

and

JOSHUA ROBBINS
Officer
United States Penitentiary, Lee
Lee County Industrial Park
Hickory Flats Road
Pennington Gap, VA 24277

and

SPENCER BOWMAN, R.N.
Health Services
United States Penitentiary, Lee
Lee County Industrial Park
Hickory Flats Road
Pennington Gap, VA 24277

and

AUSTIN DEAN
Officer
United States Penitentiary, Lee
Lee County Industrial Park
Hickory Flats Road
Pennington Gap, VA 24277

and

DUSTIN FARMER
Officer
United States Penitentiary, Lee
Lee County Industrial Park

2

Hickory Flats Road
Pennington Gap, VA 24277

and

STUART SCOTT, R.N.
Health Services
United States Penitentiary, Lee
Hickory Flats Road
Pennington Gap, VA 24277,

and

UNKNOWN DEFENDANTS 1–5

Defendants.

## COMPLAINT

Plaintiff Bryan Kimble ("Plaintiff" or "Ms. Kimble"), through undersigned counsel, files this Complaint[1] against Defendants the United States of America,  Michael Chad Hamilton, Ricky D. Bradburn, Officer Smith, Cody Ridings, Alan C. Roberts, Joshua Robbins, Spencer Bowman, Austin Dean, Dustin Farmer, Stuart Scott, and Unknown Defendants 1-5 (collectively "Defendants;" without the United States, "Individual Defendants").  Plaintiff seeks damages for injuries and injunctive relief she suffered as a result of Defendants' violation of her constitutional rights through their use of excessive force and deliberate indifference and breach of their duties to

---

[1] Prior to filing this Complaint, undersigned counsel for Ms. Kimble attempted to contact her at her current facility, USP Atwater to review the facts recounted herein.   Leaving adequate time prior to the filing deadline, undersigned counsel began attempting to schedule legal calls with Ms. Kimble on May 20, 2024.  Between May 20 and August 8, 2024, counsel sent USP Atwater five emails, and called the facility at least twice.  On August 8, 2024, undersigned counsel for Ms. Kimble finally received a response indicating that a call could not be scheduled without an "an exigent need and/or active case number".  Undersigned counsel responded the next day to explain that Ms. Kimble had an imminent court deadline.  On August 20, the facility requested an "active case . . . to confirm a deadline".   The same day, undersigned counsel explained that the deadline was an FTCA statute of limitations filing deadline and alerted Regional Counsel.  On August 23, 2024, a representative from the Western Regional Counsel's office wrote that our filing deadline did not rise to the level of a "demonstrated" need under the applicable program statement, and that the most that could be accommodated was a one-time exception that would be a 20 to 30 minute call.   Undersigned counsel was able to speak with Ms. Kimble for one hour on August 26, 2024, but was unable to confer on all of the details regarding the claims herein.  All allegations of fact are on information and belief, and Ms. Kimble reserves the right to amend this Complaint upon further discussion with undersigned counsel.

3

protect Ms. Kimble's safety.  Ms. Kimble also seeks damages based on tortious conduct committed by certain Defendants, including assault and battery.  Plaintiff hereby alleges, based on her personal knowledge, information, and belief, as follows.

## NATURE OF ACTION

1.     "Being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.'"  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (citations omitted).  Moreover, under the Eighth Amendment, prisoners must have "the minimal civilized measure of life's necessities," *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981), including "basic human needs," such as food, sanitation, and medical care.  *Id.*

2.     Ms. Kimble, a resident at United States Penitentiary Lee ("USP Lee") at all times relevant to this Complaint, is among the hundreds of residents who have been routinely subjected to unwarranted and excessive physical assaults, racial discrimination, and depravation of basic human needs in violation of the United States Constitution.  Ms. Kimble's tormentors are the Warden, guards, and other staff at USP Lee who are responsible for protecting Ms. Kimble's rights, ensuring her safety, and providing for his basic human needs.  These Defendants intentionally betray, spectacularly, these basic obligations to Ms. Kimble and the other residents at USP Lee.  At USP Lee, residents are not only serving time, but they are also being physically and mentally destroyed by the individuals tasked with carrying out their sentences.

3.     Ms. Kimble understands that, as a resident serving time in a federal penitentiary, her civil rights are subject to constraints that do not exist outside of a penitentiary.  But certain fundamental constitutional rights remain, even for an individual serving time, like Ms. Kimble. And a torture chamber sanctioned by the federal government in which Defendants brutally assault residents like Ms. Kimble; a prison administration in which almost-exclusively-white guards discriminate against and commit violent criminal acts disproportionately against persons of color;

4

a prison in which Defendants enlist and threaten residents to "put in work" by committing violent physical acts against other residents; a prison staff that dehumanizes residents by parading them nearly nude through the facility while mocking their race and genitalia (and in some instances sexually assaulting residents along the way); depriving residents of food, sanitary living conditions, and basic medical care; and employing violence and restraints for periods lasting several days in contravention of codified prison policies—none of this comes even close to meeting the lowest possible standards for resident care at a federal penitentiary.

4.      To make matters worse, Defendants have engaged in a coordinated effort to silence complaints by residents, such as Ms. Kimble, by depriving them of their limited redress for these egregiously horrifying conditions.  Defendants do so by withholding the forms residents use to lodge grievances for misconduct by prison staff, destroying said forms in those circumstances where they do distribute them, refusing to submit or mail completed grievance forms in the required timeframes, and withholding mailed correspondence from the Regional Office from residents such that their deadlines to respond pass before residents can proceed with the next step in their administrative grievance process.  Defendants also intimidate and retaliate against residents, like Ms. Kimble, who pursue legitimate administrative grievances against prison staff for abuse, including by isolating residents in the Special Housing Unit ("SHU") without justification or based on false premises; interfering with communications between residents and their counsel, and; opening and reading clearly marked privileged legal mail communications. Residents who dare to speak out against staff abuse are moved to other facilities.  As a practical matter, the limited rights residents have to pursue lawsuits for abuse pursuant to the Prison Litigation Reform Act are systematically thwarted by the administration at USP Lee through the means described above.  As a result, it is virtually impossible for a resident who has suffered abuse

and consistent torment since she stepped foot on the USP Lee compound, such as Ms. Kimble, to navigate a complex multi-step grievance process in order to exhaust her administrative remedies under 42 U.S.C. § 1997e(a) and then bring a civil lawsuit.

## JURISDICTION AND VENUE

5.    The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 171 and 28 U.S.C. § 1346(b) because Ms. Kimble's claims present federal questions regarding rights arising under the Constitution and laws of the United States, as well as claims alleging negligence and other wrongful acts by employees of the federal government.

6.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), because one or more of Defendants reside in this judicial district, and all or a substantial portion of the events, acts, or omissions giving rise to Plaintiff's claims occurred, in whole or in part, in Pennington Gap, Virginia, in the Western District of Virginia.

## PARTIES

A.    Plaintiff.

7.    Plaintiff Bryan Kimble is a forty-year-old transgender woman who, at all times relevant to this Complaint, was a resident at USP Lee.  Prior to her incarceration, Ms. Kimble resided in and was a citizen of the State of New Mexico.  Ms. Kimble arrived at USP Lee on or around September 13, 2023, the Individual Defendants taunted Ms. Kimble and within a month of her arrival, assaulted Ms. Kimble so brutally as to cause lasting damage to Ms. Kimble's internal organs, and then denied Ms. Kimble medical care.  Ms. Kimble currently resides at USP Atwater.

B.    Defendants.

8.    Defendant United States of America ("United States") created and oversees the Bureau of Prisons ("BOP"), a federal law enforcement agency within the U.S. Department of Justice that operates U.S. federal prisons and is responsible for the care, custody, and control of

6

individuals who reside at these facilities.  The United States employs all BOP correctional officers, guards, and staff named as Defendants in this action.  At all times relevant herein, the individual Defendants in this action were acting as agents of the United States.

9. Defendant Michael Chad Hamilton ("Defendant Hamilton") is a Lieutenant Officer at USP Lee.  He is sued here in his individual capacity.  Upon information and belief, Defendant Hamilton resides and works in the Commonwealth of Virginia.

10. Defendant Ricky D. Bradburn ("Defendant Bradburn") is a Correctional Officer at USP Lee.  He is sued here in his individual capacity.  Upon information and belief, Defendant Bradburn resides and works in the Commonwealth of Virginia.

11. Defendant Officer Smith ("Defendant Smith") is a Correctional Officer at USP Lee. He is sued here in his individual capacity.  Upon information and belief, Defendant Smith resides and works in the Commonwealth of Virginia.

12. Defendant Cody Ridings ("Defendant Ridings") is a Correctional Officer at USP Lee.  He is sued here in his individual capacity.  Upon information and belief, Defendant Ridings resides and works in the Commonwealth of Virginia.

13. Defendant Alan C. Roberts ("Defendant Roberts") is a Correctional Officer at USP Lee.  He is sued here in his individual capacity.  Upon information and belief, Defendant Roberts resides and works in the Commonwealth of Virginia.

14. Defendant Joshua Robbins ("Defendant Robbins") is a Correctional Officer at USP Lee.  He is sued here in his individual capacity.  Upon information and belief, Defendant Robbins resides and works in the Commonwealth of Virginia.

15.     Defendant Spencer Bowman ("Defendant Bowman") is a nurse within Health Services at USP Lee.  He is sued here in his individual capacity.  Upon information and belief, Defendant Bowman resides and works in the Commonwealth of Virginia.

16.     Defendant Austin Dean ("Defendant Dean") is a Correctional Officer at USP Lee. He is sued here in his individual capacity.  Upon information and belief, Defendant Dean resides and works in the Commonwealth of Virginia.

17.     Defendant Dustin Farmer ("Defendant Farmer") is a Correctional Officer at USP Lee.  He is sued here in his individual capacity.  Upon information and belief, Defendant Farmer resides in the Commonwealth of Kentucky and works in the Commonwealth of Virginia.

18.     Defendant Stuart Scott ("Defendant Scott") is a nurse within Health Services at USP Lee.  He is being sued in his individual capacity.  Upon information and belief, Defendant Scott resides and works in the Commonwealth of Virginia.

19.     Unknown Defendants 1-5 are USP Lee employees who worked at USP Lee at the time of Ms. Kimble's injuries.  They are sued in their individual capacities.  Upon information and belief, Unknown Defendants 1-5 work in the Commonwealth of Virginia.

## FACTS

### Ms. Kimble's Background

20.     Ms. Kimble is a forty-year-old transgender woman with a history of psychiatric conditions and trauma.

21.     Ms. Kimble was sexually assaulted by a male teacher in middle school.  As a result of this traumatic experience, Ms. Kimble began to abuse drugs to cope with the feelings that followed these occurrences.

22.     As a result of her drug use, Ms. Kimble eventually found herself in the custody of the New Mexico juvenile justice system.

8

23. While in custody, Ms. Kimble first attempted suicide. She subsequently received psychological and psychiatric interventions while in custody.

24. Following these interventions, Ms. Kimble was diagnosed with several mental health disorders, including ADD/ADHD, depression, and bipolar disorder. She in turn was prescribed several psychiatric medications, including Seroquel, Ritalin, and Wellbutrin. While not in custody, Ms. Kimble often turned to other drugs as a form of self-medication and would be non-compliant with the mental health medications prescribed to assist with her several mental health conditions.

25. As an adult, Ms. Kimble was also in the custody of the New Mexico Department of Corrections, where she was prescribed medication and received treatment for her mental health conditions.

26. In 2008, Ms. Kimble was sentenced to her first period of incarceration in the BOP. She was designated to USP Beaumont where she was incarcerated for approximately three years.

27. When she was twenty-eight years old, Ms. Kimble's then-wife murdered their son and then she committed suicide. This tragedy led Ms. Kimble to a period of heavy drug use, which eventually resulted in her incarceration back within the BOP.

28. In 2014, Ms. Kimble was designated to USP Beaumont to serve out her current sentence. Following approximately a year there, Ms. Kimble was then sent to USP Victorville. At both of these facilities, Ms. Kimble again engaged in acts of self-medication to thwart the presenting symptoms of her mental illnesses. Eventually, this drug usage would result in a variety of disciplinary infractions that would propel her transfer to the Special Management Unit ("SMU") at USP Lewisburg–a now-defunct unit that was designed to better manage residents who had severe mental illnesses, required specialized attention, or had prior behavioral issues.

29.    Following a brief stay at USP Lewisburg, Ms. Kimble would be transferred to several other institutions within the BOP, including USP Pollock and USP Cannan.

30.    In 2022, Ms. Kimble was transferred to the SMU at USP Thomson.

31.    At USP Thomson, Ms. Kimble began her transition to female and began the process of informing her family about her gender identity.  Also during this time, Ms. Kimble's youngest daughter was struggling with depression and suicidal ideation, further causing Ms. Kimble to experience mental strain.

32.    Following this flood of emotional distress, Psychology Services staff at USP Thomson diagnosed Ms. Kimble with ADD, ADHD, and depression, and she was prescribed 50 milligrams of Sertraline to be taken once daily.  In addition to medication management, Ms. Kimble also received weekly interactions from Psychology Services staff who offered various means of therapeutic counseling.

33.    In late 2022, Ms. Kimble was briefly transferred to USP Big Sandy.  While there, Ms. Kimble's prescription for Sertraline increased, and she began to regularly take 75 milligrams of Sertraline once per day.

34.    Despite being there for a brief period, Ms. Kimble was soon the victim of an assault by another resident, perpetrated due to her history of 205s[2] and her identity as a transgender woman.

35.    Ms. Kimble was then transferred to USP McCreary.  At USP McCreary, Ms. Kimble's Sertraline prescription was continued and eventually increased to 100 milligrams once daily.

---

[2] A 205 is the colloquial reference to Disciplinary Code 205, the disciplinary infraction for "engaging in sexual acts", which includes masterbation.  *Program Statement on Inmate Discipline Program* Federal Bureau of Prisons at 46 (Aug. 1, 2011), https://www.bop.gov/policy/progstat/5270_009.pdf.

36.    On March 23, 2023 while at USP McCreary, Ms. Kimble was involved in an altercation with another resident that resulted in severe injuries throughout Ms. Kimble's body.  As a result of this altercation, Ms. Kimble sustained a head contusion, a fractured mandible, injuries to the muscles and tendons in the wall of the thorax, several puncture wounds, and a fractured left ulnar avulsion.  Following this altercation, Ms. Kimble was made aware that she would be redesignated to another facility for her safety.

37.    After arriving at USP Atlanta, Ms. Kimble learned on August 22, 2023 that she would be transferred to USP Lee.  While in Atlanta, Ms. Kimble came to understand that it was not safe to walk the compound at USP Lee if you had a history of 205s.  Knowing that she had these infractions in her disciplinary record, combined with her identity as a transgender woman, Ms. Kimble feared what would happen in custody at USP Lee.  In response, while at USP Atlanta, Ms. Kimble attempted suicide by overdosing on her prescribed Lexapro and Ibuprofen to avoid being transferred to USP Lee.  Ms. Kimble's suicide attempt was unsuccessful, and she was transferred to USP Lee on September 13, 2023.

### USP Lee

38.    USP Lee is a federal penitentiary located in Pennington Gap, Virginia.

39.    USP Lee is a high-security facility that houses approximately 1,500 adult males who are considered high security offenders.[3]  USP Lee has twelve housing units located in three buildings.  Each housing unit can house 128 offenders.[4]

40.    USP Lee has one SHU.  The purported purpose of the SHU is to 1) house residents in disciplinary segregation as a result of a formal disciplinary finding; 2) house residents on

---

[3] Charles Thronton et al., *USP Lee Follow-Up Inspection Report*, D.C. Corr. Info. Council (Sept. 6, 2019), https://cic.dc.gov/sites/default/files/dc/sites/cic/page_content/attachments/USP%20Lee%20Inspection%20Report%20FINAL%20with%20BOP%20response%209-6-19.pdf.
[4] *USP Lee*, Fed. Bureau of Prisons, https://www.bop.gov/locations/institutions/lee/.

administrative detention pending transfer or investigation of a disciplinary infraction; and 3) house residents in protective custody.[5]

41.     In reality, the SHU, which is routinely kept at full capacity by USP Lee's administration, is used as a venue for extreme abuse and retaliation against residents by prison staff.  Indeed, individuals housed in the SHU often hear the screams of other residents as they are tortured by prison staff around the clock, typically within the two holding cells located in the SHU.  These holding cells do not have toilets, and individuals who are abused in those cells, often over the course of consecutive days, are forced to defecate and urinate on themselves.

42.     The prison staff, including Defendants, strategically conceal their abuse, and will often place toilet paper over the cameras in the SHU holding cells, which do not capture sound, to prevent their actions from being recorded.  In other instances, residents are taken by prison staff to blind spots in the SHU and passages leading to and from it, where cameras cannot record the abuse that occurs.  In still other instances, prison staff will threaten an individual to violently attack their cellmate within their own cell, where cameras are also not located.

43.     To further conceal their abuse, residents are forced, under the threat of additional violence, to state in a video recording captured by medical personnel that they do not have any injuries.

44.     The SHU contains a medical examination room that is rarely, if ever, used to conduct actual medical evaluations.  The medical staff tasked with providing care in the SHU, including mental health professionals, are deliberately indifferent to the abuse and torture that takes place, and the severe injuries that result.  USP Lee medical staff are often complicit in the efforts of other prison staff to conceal injuries by ignoring injuries to prisoners and/or by falsifying

---

[5] *Program Statement on Special Housing Units*, Federal Bureau of Prisons at 3–6; 9 (Nov. 23, 2016), https://www.bop.gov/policy/progstat/5270.11.pdf.

medical reports.  Indeed, medical staff, including Defendant Bowman, are often present in the cell (and sometimes themselves participate in the assault of residents) while prisoners are being repeatedly kicked, punched, and tortured by prison staff, but they nevertheless report that victims have suffered no injuries.

45.    The conditions of confinement in the SHU are inhumane.  Individuals are not provided proper or clean clothing and are sometimes forced by prison staff to wear paper gowns that expose their genitalia—leading to sexually and racially abusive commentary, and at times sexual abuse, by prison staff.  When prisoners are given SHU uniforms, they are often forced to wear the same tattered, dirty clothing for several days in a row.  Individuals are given a total of 10–12 squares of toilet paper per day.  The toilets malfunction regularly, and individuals are forced to leave their feces in towels until maintenance staff arrives, which sometimes takes several days.  Individuals are forced to eat bologna sandwiches after prison staff smear them across a dirty floor.  In some cases, food is withheld from prisoners altogether for days on end.  Recreation time is inconsistent and generally nonexistent.  Windows in the SHU are sandblasted which prevents any natural light from entering cells, leaving residents to receive small slivers of sunlight through tiny cracks in the sandblast.

46.    Access to the law library in the SHU is non-existent due to prison staff routinely reporting that the law library computers are broken or inaccessible.

47.    Prisoners suffering from these horrible conditions and treatment are given only limited access to grievance forms to lodge complaints against USP Lee staff.  USP Lee officers will not only refuse to give the grievance forms to individuals who request them, but when they do, will also at times provide the wrong form, and/or fail to transmit completed grievance forms

to the appropriate personnel in the required timeframes.  Indeed, USP Lee officers threaten individuals who attempt to access administrative grievances with more and more severe violence.

48.    Although the SHU is generally reserved for individuals who either pose a threat to other residents, staff, or are at risk of harm, Defendant Bradburn, Defendant Smith, Defendant Ridings, Defendant Robbins, and Defendant Hamilton contribute to the confinement of individuals like Ms. Kimble in the SHU for no legitimate reason.  Residents are remanded to the SHU (which is almost always fully occupied) so that prison staff can take advantage of seemingly vulnerable residents, and/or as a retaliation for an individual's complaints regarding the unconstitutional conditions at USP Lee and/or requests for medical and mental health care.

49.    When all of the cells in the SHU are full and prison staff want to transfer an individual in a particular unit to the SHU, the resident's particular unit is placed on "lockdown."  When a unit is on lockdown, individuals in that unit do not receive hot meals, are not permitted to shower regularly, do not receive clean clothing, do not receive phone calls or visits from family, and cannot access the prison's programming or the law library.

50.    The almost-exclusively-white prison staff at USP Lee discriminates against residents of color by disproportionately targeting them for physical violence, depriving them of medical attention and other basic rights, and housing them in the SHU.  Prison staff also regularly, consistently, and openly use vulgar racial epithets to refer to Black and Hispanic residents.  As they did with Ms. Kimble, Defendants take pride in their culture of violence against non-white residents by gruesomely pulling out residents' hair and hanging it for display on the penitentiary's fences.

51.    Prison staff often force prisoners to "put in work" by fighting each other, targeting certain residents for violence.  USP Lee officers purposefully pair individuals who pose a safety

14

threat to each other in the same cell—creating dissonance between them by sharing otherwise protected information about the individual's prior conviction or disseminating lies about the same based on prior disciplinary infractions. USP Lee officers will alert one cellmate that the other is a child molester, referring to the offending resident as a "cho mo," and then demand that his non-offending cellmate beat the one labeled as a "cho mo." USP Lee officers threaten to physically assault and abuse any cellmates who do not comply. As a result, most cellmates agree to fight each other rather than risk organized assault by the USP Lee officers.

52.     The culture of inhumane violence and abuse at USP Lee, experienced first-hand by Ms. Kimble, has been previously documented at length. In a September 6, 2019 "Follow-Up Inspection Report,"[6] investigators at the District of Columbia Corrections Information Council (the "CIC")[7] reported a litany of unconstitutional and sub-standard practices, including the following:

- Many residents expressed the expectation that they would face some form of retaliation for their participation in CIC interviews, from physical assaults by staff, to loss of facility jobs, to having their mail held for an excessive period.[8]

- Individuals reported being left in four-point restraints for 12 to 13 hours and more than 16 hours without access to toilets.[9]

---

[6] *See generally* Charles Thronton et al., *USP Lee Follow-Up Inspection Report*, D.C. Corr. Info. Council (Sept. 6, 2019), https://cic.dc.gov/sites/default/files/dc/sites/cic/page_content/attachments/USP%20Lee%20Inspection%20Report%20FINAL%20with%20BOP%20response%209-6-19.pdf.

[7] The District of Columbia does not maintain its own prison system. Instead, individuals sentenced for felony offenses under the D.C. Code are transferred to the federal Bureau of Prisons. The CIC is an independent oversight entity maintained by the U.S. Congress and the Council of the District of Columbia to inspect, monitor and report on conditions of confinement at all facilities, including federal facilities, where D.C. Code offenders are housed.

[8] *Id.* at 8, I.

[9] *Id.* at 8, II.

- Several individuals mentioned a regular practice in which residents were assaulted, restrained, put in a paper gown, and forced to walk backwards in view of other residents.[10]

- One resident was slammed to the ground by an officer and then tied to a chair and left in an office for an hour before being transported to the SHU.[11]

- Residents said that staff beat residents with apples in socks or through a shield to prevent leaving marks of the assault.

- Individuals reported sexual assault or sexual harassment by staff, including seeing an officer grab a resident's testicles.

- One resident reported that a lieutenant put a shield on the resident's chest, and kneeled on it while the resident was on his back and shackled.[12]

- Prison staff regularly use racial slurs.[13]

- During cell shakedowns, officers routinely sweep residents' belongings into the trash, including clothes, food, and hygiene products purchased off commissary, and fail to provide documentation of the confiscation of their property.[14]

- The USP Lee staff undermine or outright foreclose residents from pursuing the Bureau of Prisons Grievance Process. Residents have complained of being told by Warden Streeval that grievances would "never make it out of the

---

[10] *Id.*
[11] *Id.*
[12] *Id.*
[13] *Id.* at 8, IV.
[14] *Id.*

SHU."[15] Other prison staff have told residents that their complaints will never go anywhere "because the Warden will lie for his staff."[16]

- Officers and USP Lee leadership have refused to separate cellmates who requested separation due to interpersonal conflict and the inherent safety risks caused by the conflicts, and have told residents to fight or stab each other.[17]

- Residents are not provided adequate medical care.[18]

- Residents have been forced to clean up raw sewage flooding into the cells without adequate protection.[19]

- USP Lee was on lockdown for most of 2018 because the SHU was operating at or near capacity.[20]

53.    As described further below, nothing has changed at USP Lee since the CIC report was issued.  Indeed, undersigned counsel has filed in this Court no less than five matters on behalf of USP Lee residents, all alleging excessive use of force in virtually the same context as alleged by Ms. Kimble.  The injuries sustained by Ms. Kimble in 2023 and the unconstitutional practices that continue to be the norm at USP Lee are just the latest in a history of abuse that goes back many years.

**BOP Guidelines on Use of Force**

54.    The injuries sustained by Ms. Kimble arose from practices that are expressly forbidden under the policies and regulations that govern staff conduct at USP Lee.

---

[15] *Id.*
[16] *Id.*
[17] *Id.*
[18] *Id.* at 11, V.
[19] *Id.* at 12, VI.
[20] *Id.* at 9, III.

55.     The BOP strictly limits the use of force, including the placement of residents in restraints, as a last alternative after all other reasonable efforts to control a resident or situation have failed.[21]  When authorized, staff must use only that amount of force necessary to gain control of the resident, to protect and ensure the safety of other residents, to prevent serious property damage, and to ensure institutional security and good order.[22]

56.     Prison staff may only use physical restraints if it is necessary to gain control of a resident who appears to be dangerous because the resident:  (a) assaults another individual; (b) destroys government property; (c) attempts suicide; (d) inflicts injury upon self; or (e) becomes violent or displays signs of imminent violence.[23]

57.     Under no circumstances may physical restraints be employed to punish residents.[24]

58.     BOP regulations further state that prison staff may temporarily apply physical restraints when one of the above requirements is met; however, the Warden or designee must decide whether the use of physical restraints should continue.[25]  If physical restraints are used, BOP policy mandates that the least restrictive restraint method be used that is necessary for the situation.[26]  Specifically, "ambulatory restraints" (i.e., handcuffs, leg irons, and a belly chain) should initially be used if possible, and "four-point restraints" (i.e., chaining a resident to a bed at his wrists and ankles) should be used if they are the only means available to obtain and maintain control over a resident.[27]

---

[21] *Program Statement on Use of Force and Application of Restraints*, Federal Bureau of Prisons ¶ 5 (Nov. 30, 2005), https://www.bop.gov/policy/progstat/5566_006.pdf.
[22] *Id.* ¶ 6(c).
[23] *Id.* ¶ 1.
[24] *Id.* ¶ 6(h)(1).
[25] *Id.* ¶ 6(d).
[26] *Id.* ¶ 9.
[27] *Id.* ¶ 10.

59.     Under BOP policy, all "use of force incidents must be reported and investigated . . . to eliminate the unwarranted use of force."[28]  In addition, prison staff must report the use of force directly to the Assistant Director, Correctional Programs Division; Assistant Director, Health Services Division; Central Office Correctional Services Administrator; Regional Director; and the Regional Correctional Administrator.[29]  These reporting protocols ensure that BOP management, from prison staff to the Warden to the Regional Director of the BOP, participates in the decision-making and monitoring process in the use of force, and that prison staff do not inappropriately use force on residents.

60.     As discussed further below, virtually none of these BOP regulations were complied with in using restraints on Ms. Kimble.

**Defendants' Assault of Ms. Kimble**

61.     On September 13, 2023, Ms. Kimble arrived at USP Lee.  Upon her arrival, Ms. Kimble requested to be placed in protective custody due to concerns for her safety noted above.

62.     Additionally, Ms. Kimble filled out a form with her medical history.  She included that she was previously prescribed Sertraline to manage her depression. Ms. Kimble arrived at USP Lee with a 14-day prescription and supply of Sertraline that she was to keep on her person and self-administer one time per day.

63.     Soon after arriving at USP Lee, staff began to taunt and antagonize Ms. Kimble.  It became common practice for staff to yell inappropriate or derogatory remarks about Ms. Kimble as they passed her cell door.  Staff took it a step further by also withholding several meals from Ms. Kimble, covering their actions up by stating she "refused" to accept the meals.

---

[28] *Id.* ¶ 6(j).
[29] *Id.* ¶ 14(a)(1)–(5).

19

64.     On one specific instance, on October 4, 2023, Defendant Farmer labeled Ms. Kimble a "sex offender" and in turn placed a "hands up" sign on Ms. Kimble's door for no legitimate reason.  The "hands up" sign is to indicate to staff that the person in the cell has recently been found guilty of committing a sexual act in the presence of a staff member, also known, as described above, as a 205 disciplinary infraction.  Despite the intent of the sign being to protect staff from undue sexual harassment, staff at USP Lee use the sign to taunt and harass residents for 205s that were issued months if not years prior to their arrival at USP Lee.  Staff do this, as the sign signals to other staff and residents that the resident has been found guilty of a sex-related infraction and are thus "lesser than" and should be met with negative treatment and other forms of harassment.

65.     On the morning of October 9, 2023, around 8:30 a.m., Defendant Dean announced to the range of the SHU "we got some dick jackers in this cell, referring to both Ms. Kimble and her cellmate."  Defendant Dean's statement made it known to other individuals and staff in the SHU that Ms. Kimble and his cellmate were both "cho-mos", a shorthand slang term for child molesters.

66.     Shortly after Defendant Dean made the above statement, Defendant Dean pressed his emergency alert button to call upon other staff to respond to an "incident" in the SHU.  This "emergency" allowed Defendant Dean to call other staff to the SHU to "assist" him.  However, Ms. Kimble and her cell mate were in fact not fighting each other as they had each been on their respective bunks at the time of the distress transmission.  When "backup" arrived, Defendant Farmer ordered Ms. Kimble and her cellmate to stop fighting and cuff up, even though each was actually laying in their respective bunks at the time Defendant Dean called the "emergency".  Immediately after yelling at Ms. Kimble and her cellmate, Defendant Farmer opened the slot in

20

their cell door to administer a chemical agent and "subdue" Ms. Kimble and her cell mate.  Seeing and hearing this, Ms. Kimble and her cellmate immediately moved toward the slot in the door and complied with Defendant Farmer's order to cuff up.

67.     Once the handcuffs were applied, Ms. Kimble and her cellmate were both duck-walked—that is, bent at the waist and backwards—down the SHU range and placed into separate holding cells.

68.     As soon as Ms. Kimble was brought into the holding cell, Defendants Bradburn, Smith, Robbins, and Ridings assaulted Ms. Kimble, hitting and punching her while she remained handcuffed behind her back.

69.     Defendants Bradburn, Smith, Robbins, and Ridings all beat Ms. Kimble while also calling Ms. Kimble various slurs, including "faggot" and "cho-mo."

70.     During the assault, one of the Defendants slammed Ms. Kimble's head into the corner of the wall at least four times, leading to various contusions and bruising on Ms. Kimble's head.

71.     Defendant Smith also punched Ms. Kimble in the back of the head and in her left ear.  Following this, Defendant Bradburn grabbed Ms. Kimble's head and instructed Defendant Smith to punch Ms. Kimble in her face instead of her head.  Defendant Smith proceeded to hit Ms. Kimble in the face at least five more times over the course of the assault.  The hits to Ms. Kimble's head and face caused visible bleeding and swelling (and later bruising); a bleeding and likely broken nose; clusters of bruised and inflamed tissue across her face; and several loose teeth in the top left side of her mouth.

72.     The assault was so brutal that Ms. Kimble thought to herself, "please just don't kill me."

21

73.     Noticing the amount of blood streaming from Ms. Kimble's nose, Defendant Bradburn called to another officer to bring "cutters" to the holding cell to remove Ms. Kimble's blood-stained clothing.  Defendant Bradburn further instructed the SHU orderly to mop the path from the cell Ms. Kimble once shared with her cellmate to make it seem like both Ms. Kimble and her cellmate were already bleeding when they were extracted from the cell.  But Ms. Kimble was not bleeding until the Individual Defendants began assaulting and beating Ms. Kimble in the holding cell.

74.     Shortly thereafter, Defendant Bowman approached the holding cell and called Ms. Kimble "a little piece of shit jacker" before asking Ms. Kimble where she was bleeding from. After Ms. Kimble informed him that her nose was bleeding, Defendant Bowman grabbed a towel to clean up the blood and chemical agent that still covered Ms. Kimble's face and body.  Staff then proceeded to decontaminate Ms. Kimble and changed her out of her blood and mace-stained clothing into a fresh pair of orange pants and a shirt to cover the visible injuries to her body.  During these "clean-up" efforts, Defendant Bowman whispered to Ms. Kimble that once everything was over and she was back in her cell, "[she] should just go on and kill [herself]."

75.     While Defendant Bowman was helping Ms. Kimble, Defendant Bradburn told the other officers in the vicinity to turn off their radios and "go offline."  Ms. Kimble had never experienced correctional officers turning off their radios and experience a renewed sense of anxiety and fear for her life.

76.     Once the decontamination process was completed, Defendant Hamilton threatened Ms. Kimble, instructing her not to report any injuries.  After placing the fresh clothes on Ms. Kimble, Defendant Bowman took Ms. Kimble's vital signs, and asked Ms. Kimble a leading question, "you don't have any injuries to report, do you?"

22

77.    Ms. Kimble replied that she was in fact injured and required medical attention. However, after receiving additional threats from the staff around her, Ms. Kimble indicated that she had no injuries at that time.

78.    Despite clear evidence that Ms. Kimble had been injured, and her interjection confirming this, Defendant Bowman remarked that she had "no injuries", left the room, and thereafter documented as much in his medical report.

79.    After Defendant Bowman's "assessment," Defendant Hamilton approached Ms. Kimble and asked her who she "ran with," that is, asked her what group of residents Ms. Kimble associated with.  From Ms. Kimble's perspective, this question was an effort to learn if there was any way he could bring additional harm to Ms. Kimble by turning other residents against her. Before she could answer, Defendant Bradburn interjected and said that Ms. Kimble ran with the Surenos, a notable Mexican gang, while Ms. Kimble replied "New Mexico."  During this interaction, Defendant Ridings whispered to Ms. Kimble, "don't tell him anything we have people all over the BOP," effectively warning Ms. Kimble that a truthful answer would be used by Defendant Bradburn to put her in harm's way—in institutions where rival groups might have the knowledge and access to cause her harm.   Ms. Kimble also understood it to mean that if she reported what happened to her at USP Lee once she arrived at another facility, the Defendants would learn about it.

80.    Defendant Hamilton told Ms. Kimble that when she went to her disciplinary hearing for the falsified assault, she should admit that she called her cell-mate a "nigger," which prompted her cell mate to assault Ms. Kimble and Ms. Kimble to defend herself.  Ms. Kimble did not agree to tell that story, but Defendant Hamilton threatened Ms. Kimble, "if we find out anything different, we are going to keep whooping your ass."  He then grabbed Ms. Kimble by the face and asked

23

"you're going to do what we say, do you understand?" to which, again fearing further retribution, Ms. Kimble said yes.

81.     Ms. Kimble was then moved to a different holding cell in the SHU where an unknown Defendant put Ms. Kimble in leg irons.  The officer then slammed the restraints into the ground so hard that Ms. Kimble experienced terrible pain and a deep gash in her leg that eventually healed into a large, visible scar.

82.     Defendant Hamilton then shoved Ms. Kimble into the wall, forced her to kneel and spread her knees.  While Ms. Kimble was in this position, Defendant Hamilton kicked Ms. Kimble in the groin.  Defendant Ridings exclaimed, "that was a good kick."  Defendant Roberts called Ms. Kimble a "faggot".  Other unknown Defendants repeatedly slammed Ms. Kimble's head into the concrete wall, punched her in the head, and then forced her to her feet.  Adding to the physical abuse, Defendants also taunted Ms. Kimble about her history of "205s", using derogatory slurs to refer to Ms. Kimble, including Defendant Hamilton telling Ms. Kimble to "man the fuck up."

83.     The Defendants told Ms. Kimble to remain on her knees and warned that each time they came to check her, she was expected to be on her knees with her head facing and leaning against the wall.

84.     In all, the assault lasted from approximately 8:30 a.m. when Ms. Kimble was removed from her cell until between 1:30 to 2:00 p.m., when Ms. Kimble was moved back to a new cell on the SHU range with a different cellmate, between 1:30 and 2:00 p.m.

85.     Following the assault on October 9, 2023, Ms. Kimble experienced a variety of injuries, including contusions, bruises, and swollen knots; black eyes; pain and injury to her leg including a deep gash where the leg restraints were slammed into the floor; potential testicular

24

dislocation into her abdomen; ringing and blood in her ears; and loose teeth in the upper left side of her mouth.

**Ms. Kimble's Response and Trauma from the October 9, 2023 Assault**

86.    Following the assault on October 9, 2023, Ms. Kimble submitted fourteen requests to both Health Services and Psychology Services for treatment of her injuries and to help her cope with the emotional distress that was caused by the Individual Defendants' actions days before. Those requests went largely ignored.

87. Despite the serious injuries, and the frequency of her sick call requests, Ms. Kimble was not seen by Defendant Scott until October 25, 2023.  During the interaction, Defendant Scott told Ms. Kimble that she would need to get over-the-counter medication from commissary before she could be referred to a doctor.  No physical examination of her injuries took place.

88.    When Ms. Kimble specifically mentioned the injury to her groin, namely that could not feel one of her testacies and worried that it was lodged and stuck in her abdomen, Defendant Scott told her that this was simply her body's reaction to "trauma" from being kicked in the groin. Defendant Scott refused to examine Ms. Kimble's scrotum and testicles, despite Ms. Kimble's explicit request that he do so.

89.    Ms. Kimble further explained that she had seen blood coming out of her left ear.  In response, Defendant Scott claimed Ms. Kimble was experiencing backed-up ear wax.  Anticipating this kind of response, Ms. Kimble previously attempted to remove any ear wax build-up; she purchased a removal kit from commissary and used it prior to the visit with Defendant Scott, but nothing came out.  Defendant Scott, despite this information, put peroxide in Ms. Kimble's left ear.  Nothing came out.  There was no treatment for the bleeding in Ms. Kimble's left ear.

90.    After the interaction with Defendant Scott, Ms. Kimble received only limited and insufficient medical treatment.  Ms. Kimble took a urine test to determine if her kidneys were

infected, she had x-rays taken of her chest and abdomen, and then she was taken to an outside provider to review her injuries.  On November 16, 2023, the outside provider recommended that Ms. Kimble receive a CT scan, believing that Ms. Kimble may have an inflamed or infected appendix as a result of her testicular dislocation.

91.    Ms. Kimble submitted follow-up requests regarding the status of the CT scan. Despite the provider's recommendation, Ms. Kimble was told on December 19, 2023 that her CT scan was denied.

92. Following the news of her CT scan being denied, on December 19, 2023, a new member of the Health Services staff, Nurse Polly, attempted to order an ultrasound of Ms. Kimble's scrotum. Upon information and belief, Ms. Kimble never received an ultrasound at USP Lee.

93.    Ms. Kimble is still struggling to heal both physically and mentally from the abuse and torture she sustained at USP Lee on October 9, 2023.  Almost a year later, she continues to suffer extreme pain, including rampant headaches, three loose teeth, a cyst behind one of her front teeth, acute pain in her abdomen, various scars throughout her body, paranoia, depression, and anxiety.

## CAUSES OF ACTION
## COUNT ONE

*Violation of Plaintiff's Eighth Amendment Rights – Gratuitous Violence*
*(Against Defendant Hamilton, Defendant Bradburn, Defendant Smith, Defendant Ridings, Defendant Roberts, Defendant Dean, Defendant Robbins, Defendant Farmer and Unknown Defendants)*

94.    Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

95.    The Eighth Amendment to the United States Constitution prohibits "cruel and unusual punishment."

26

96.    As outlined above, on or around the date of October 9, 2023, Ms. Kimble was brutally beaten, slammed into the wall, and kicked in the groin without justification and for the very purpose of causing harm, by Defendant Hamilton, Defendant Bradburn, Defendant Smith, Defendant Ridings, Defendant Roberts, Defendant Dean, Defendant Robbins, Defendant Farmer, and other unknown Defendants, while being held in various forms of restraints, in violation of explicit BOP policies and the Eighth Amendment.

97.    Ms. Kimble sustained severe physical injuries, including contusions, bruises, and swollen knots on her face; black eyes; pain and injury to her leg including a gash where the leg restraints were slammed into the floor; testicular dislocation into her abdomen; ringing and blood in her ears; headaches; and loose teeth in the upper left side of her mouth; as well as emotional distress and mental anguish, as a result of the Defendants' assault on or around October 9, 2023.

98.    As a direct, foreseeable, and proximate result of the Defendants' deliberate indifferences to Ms. Kimble's health and safety in violation of her Eighth Amendment rights on or around October 9, 2023, Ms. Kimble has suffered damages, including, without limitation, incidental, actual, consequential, and compensatory damages.  Additionally, as a result of the Defendants' egregious, intentional, and reckless conduct in conscious disregard for Ms. Kimble's safety, as well as their pattern and practice of repeatedly violating Ms. Kimble's Eighth Amendment rights, Ms. Kimble is entitled to punitive damages, as well as such other appropriate damages and relief permitted by law, all in an amount to be determined at trial.

## <u>COUNT TWO</u>

*Violation of Plaintiff's Eighth Amendment Rights – Failure to Protect*
*(Against Defendant Bowman)*

99.    Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

100. The Eighth Amendment to the United States Constitution prohibits "cruel and unusual punishment." This includes the right to be protected from known and substantial risks of serious harm.

101. As outlined above, on or around October 9, 2023, Ms. Kimble was brutally assaulted, repeatedly, without justification, by Defendant Hamilton, Defendant Bradburn, Defendant Smith, Defendant Ridings, Defendant Roberts, Defendant Dean, Defendant Robbins, Defendant Farmer and other unknown Defendants, while being held in various forms of restraints, in violation of explicit BOP policies and the Eighth Amendment.

102. Defendant Bowman did not actively participate in Ms. Kimble's abuse, but also violated Ms. Kimble's Eighth Amendment rights by disregarding and failing to protect her from the risk of known, unnecessary, and gratuitous force, deliberately indifferent to Ms. Kimble's health and safety.

103. As noted above, Defendant Bowman came into the cell where Ms. Kimble was standing, ragged, swollen, and bleeding, and assisted officers in cleaning the blood and chemical agent from her person, and changing her blood-stained clothes. Defendant Bowman was in the room when Defendant Hamilton threatened Ms. Kimble not to report any injuries, and despite this, heard Ms. Kimble say that she did have injuries. After enduring additional threats, Ms. Kimble then indicated to Defendant Bowman that she had no injuries.

104. As a result of Defendant Bowman's failure to intervene, Ms. Kimble suffered severe physical injuries, including at least one deep gash in her leg from the use of leg restraints, and an intentional kick to the groin, which was not only nauseating and debilitating in the moment, but caused a testicular dislocation, the effects of which Ms. Kimble is still suffering.

28

105.   It would have been clear to any reasonable observer, and was clear to Defendant Bowman – especially given the blood on Ms. Kimble's face and clothing, and the threats from Defendant Hamilton and others –that other Defendants had previously assaulted Ms. Kimble and were all but certainly going to continue to do so.  Despite this, Defendant Bowman disregarded and failed to protect Ms. Kimble from the risk of known, unnecessary, and gratuitous force, and was deliberately indifferent to her health and safety.

106.   As a direct, foreseeable, and proximate result of the Defendants' deliberate indifference to Ms. Kimble's health and safety, in violation of his Eighth Amendment rights on October 9, 2023, Ms. Kimble has suffered damages, including, without limitation, incidental, actual, consequential, and compensatory damages.  Additionally, as a result of the Defendants' egregious, intentional, and reckless conduct in deliberate indifference to Ms. Kimble's safety, as well as their pattern and practice of repeatedly violating Ms. Kimble's Eighth Amendment rights, Ms. Kimble is entitled to punitive damages, as well as such other appropriate damages and relief permitted by law, all in an amount to be determined at trial.

## <u>COUNT THREE</u>

*Violation of Plaintiff's Eighth Amendment Rights – Medical Care*
*(Against Defendant Scott)*

107.   Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

108.   The Eighth Amendment to the United States Constitution prohibits "cruel and unusual punishment."  This right includes the right of residents in federal prison to receive adequate medical care.

29

109.    Defendant Scott's deliberate indifference to the injuries Ms. Kimble suffered as a result of her brutal assault caused avoidable physical pain and suffering, mental anguish, emotional distress.

110.    As outlined above, on or around October 9, 2023, Ms. Kimble was brutally beaten by certain of the Defendants while being held in various forms of restraints, in violation of explicit BOP policies and the Eighth Amendment.  When Ms. Kimble sought medical assistance for her injuries sustained in these assaults, she was ignored.  Defendant Scott's failure to provide any medical treatment despite having been told by Ms. Kimble that she was physically assaulted and at minimum, observing and failing to treat, or refusing to evaluate injuries altogether also reflect deliberate indifference to Ms. Kimble's serious medical care needs, and violate the Cruel and Unusual Punishment Clause of the Eight Amendment of the United States Constitution.

111.    Having seen what was visible and heard Ms. Kimble's reports of non-visible injuries, it would have been clear, both objectively, and to Defendant Scott in particular, that Ms. Kimble required medical attention.  Instead, however, despite Ms. Kimble's repeated requests, Defendant Scott failed to provide any medical or mental health care whatsoever for these injuries, leaving Ms. Kimble in excruciating physical pain and mental anguish for a period of several months.

112.    As a direct, foreseeable, and proximate result of Defendant Scott's deliberate indifference to Ms. Kimble's serious medical needs, Ms. Kimble has suffered unnecessary and wanton infliction of pain in violation of the Eighth Amendment.  And as a result, she is entitled to damages, including, without limitation, incidental, actual, consequential, and compensatory damages.  Additionally, as a result of Defendant Scott's egregious, intentional, and reckless conduct in conscious disregard for Ms. Kimble's safety, as well as his pattern and practice of

30

repeatedly violating Ms. Kimble's Eighth Amendment rights, Ms. Kimble is entitled to punitive damages, as well as such other appropriate damages and relief permitted by law, all in an amount to be determined at trial.

## COUNT FOUR

*Assault and Battery Pursuant to the Federal Tort Claims Act 28 U.S.C. § 1346(b)*
*(Against Defendant United States of America)*

113.    Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

114.    The Federal Tort Claims Act permits private parties to sue the United States of America in a federal court for torts, including intentional torts arising out of assault, battery, false imprisonment, false arrest, abuse of process, and malicious prosecution, committed by persons acting on behalf of the United States of America, including the acts or omissions of investigative or law enforcement officers of the United States Government.

115.    Under Virginia law, assault is established by:  (1) an act intended to cause either harmful or offensive contact with another person, or (2) apprehension of such contact, and that creates in that other person's mind a reasonable apprehension of an imminent battery.  Battery is an unwanted touching which is neither consented to, excused, nor justified.

116.    As outlined above, on or around October 9, 2023, Defendant Hamilton, Defendant Bradburn, Defendant Smith, Defendant Ridings, Defendant Roberts, Defendant Dean, Defendant Robbins, Defendant Farmer, and Unknown Defendants 1-5 repeatedly touched Ms. Kimble in a vicious, rude, insulting, brutal, unwanted, and offensive manner, thereby causing Ms. Kimble significant harm.

117.    These touchings by these Defendants were unsolicited by Ms. Kimble, unwanted, and wholly inappropriate.  The touchings were neither consented to, excused, nor justified.

Furthermore, the Individual Defendants engaged in acts, including berating Ms. Kimble and using derogatory remarks such as "faggot," against her and placing the "hands up" sign on her door intending to cause harmful and offensive contact with Ms. Kimble to create a reasonable apprehension of immediate, unwanted touching of Ms. Kimble. These acts constitute assault and battery.

118. At the times the tortious conduct by Defendant Hamilton, Defendant Bradburn, Defendant Smith, Defendant Ridings, Defendant Roberts, Defendant Dean, Defendant Robbins, Defendant Farmer and Unknown Defendant was committed against Ms. Kimble, each of these Defendants were acting within the scope of his employment duties as officers and agents of the federal government, and therefore, such conduct is imputable to Defendant United States of America.

119. The actions by these officers were malicious, intentional, and amounted to extreme and outrageous conduct. As a proximate result of such conduct, Ms. Kimble has and continues to suffer physical injuries, including contusions, bruises, and swollen knots on her face; black eyes; pain and injury to her leg including a gash where the leg restraints were slammed into the floor; testicular dislocation into her abdomen; ringing and blood in her ears; headaches; and loose teeth in the upper left side of her mouth; as well as emotional pain and suffering for which the United States of America is liable.

## COUNT FIVE

*(Negligence Pursuant to the Federal Tort Claims Act 28 U.S.C. § 1346(b))*
*(Against Defendant United States of America)*

120. Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

121.    The Federal Tort Claims Act permits private parties to sue the United States of America in a federal court for torts committed by persons acting on behalf of the United States of America.

122.    Under Virginia law, a negligence claim is established by: (1) the existence of a duty of care; (2) breach of that duty; (3) legal causation; and (4) damages.

123.    Defendant Bowman and Defendant Scott, in the exercise of reasonable care, and pursuant to their authority and responsibilities as medical providers, officials, employees, and/or agents of the United States of America, had a duty to know, or should have known that their failure to intervene to prevent or limit Ms. Kimble's assault, as well as their failure to provide adequate medical care to Ms. Kimble during and post-assault, put Ms. Kimble at risk of physical, mental and emotional injury.

124.    Defendants Bowman and Scott, in their capacity as and pursuant to their authority and responsibilities as medical providers, officials, employees, and/or agents of the United States of America, breached their duty by failing to carefully investigate, monitor, supervise, provide and/or oversee the provision of adequate medical care to Ms. Kimble at USP Lee, including but not limited to the failure to intervene to prevent or limit Ms. Kimble's assault, or to provide adequate medical care during and following Ms. Kimble's assault.

125.    Defendants Bowman and Scott knew or should have known that Ms. Kimble would foreseeably suffer injury as a result of their failure to exercise reasonable care in the discharge of their official duties and/or common-law duties of care described herein.

126.    As a direct and proximate result of the negligence and carelessness of the Individual Defendants, Ms. Kimble has suffered extreme physical, emotional, and mental distress. As a direct

33

and proximate result of the Individual Defendants' acts or omissions, Ms. Kimble has suffered

injuries for which she seeks compensatory and actual damages against the United States.

## COUNT SIX

*(Medical Malpractice Pursuant to the Federal Tort Claims Act 28 U.S.C. § 1346(b))*
*(Against Defendant United States of America)*

127.    Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as

though fully set forth herein.

128.    The Federal Tort Claims Act permits private parties to sue the United States of

America in a federal court for torts committed by persons acting on behalf of the United States of

America.

129.    Virginia law recognizes medical malpractice claims where a plaintiff establishes

that a defendant violated the applicable standard of care and, therefore, was negligent, and that the

defendant's negligent acts were the proximate cause of injury or death.

130.    Defendant Bowman and Defendant Scott, in their capacity as pursuant to their

authority and responsibilities as medical providers, officials, employees and/or agents of the

United States of America, owed Ms. Kimble a duty to render medical care and services using the

reasonable care, skill, or knowledge ordinarily used under similar circumstances.

131.    Defendant Bowman and Defendant Scott breached their duty of care by failing to

carefully investigate, monitor, supervise, provide and/or oversee the provision of adequate medical

care to Ms. Kimble at USP Lee, including but not limited to the failure to intervene to prevent or

limit Ms. Kimble's assault, or to provide adequate medical or care during and following Ms.

Kimble's assault. As a proximate and causal result of the malpractice of the Defendant Bowman

and Defendant Scott, Ms. Kimble has endured physical, mental, and emotional pain and suffering

for which the United States of America is liable.

34

## RELIEF SOUGHT

A.     Plaintiff seeks to be fully and fairly compensated for her injuries, pain, suffering, emotional, and mental distress to the fullest extent permitted under federal law;

B.     Plaintiff requests $10,000,000 in compensatory damages from Defendants;

C.     Plaintiff requests $5,000,000 in punitive damages from Defendants;

D.     Plaintiff requests pre-judgment interest and post-judgment interest, together with an award of fees incurred in this case (including attorneys' fees), expenses, disbursements, and costs arising from this action; and

E.     Plaintiff requests any and all other relief this Court deems just and proper.

## JURY DEMAND

Plaintiff requests a trial by jury on all counts so triable.


Dated:  August 26, 2024                    Respectfully submitted,

                                           [Signatures on the following page]

/s/ W. Hunter Winstead
**W. Hunter Winstead**
Virginia Bar Number: 66770
December L. Huddleston
(*pro hac vice* forthcoming)
William H. Swain
(*pro hac vice* forthcoming)
Chelsea A. Krzaczek
(*pro hac vice* forthcoming)
Gilbert LLP
700 Pennsylvania Avenue, SE
Suite 400
Washington, DC 20003
Telephone:   (202) 772-2301
Email: WinsteadH@GilbertLegal.com
Email: HuddlestonD@GilbertLegal.com
Email: SwainW@GilbertLegal.com
Email: KrzaczekC@GilbertLegal.com

/s/ Kristin L. McGough
Kristin L. McGough
(*pro hac vice* forthcoming)
Washington Lawyers' Committee for Civil
Rights and Urban Affairs
700 14th Street, NW
Suite 400
Washington, DC 20005
Telephone:   (202) 319-1000
Email: Kristin_McGough@washlaw.org

*Counsel for Plaintiff Bryan Kimble*